**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Rafael Correa,** | ) | **CASE NO. 1:10 CV 2273** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **James J. Simone, Jr., et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon Motion for Summary Judgment filed by

Defendants City of Cleveland and Police Chief Michael McGrath (Doc. 27) and Motion for

Summary Judgment filed by Defendant James Simone (Doc. 28).  This case arises out of the

tasering of plaintiff by defendant Simone.  For the following reasons, the motion filed by the

City and McGrath is granted and the motion filed by Simone is granted in part and denied in

part.

<u>**Facts**</u>

Plaintiff, Rafael Correa, filed this Complaint against defendants, Officer James J.

1

Simone, Jr., Officer Joseph F. Wright, Officer Matthew J. Craska, City of Cleveland, and

Chief of Police Michael McGrath. Defendants Craska and Wright have been previously

dismissed by stipulation of the parties.  Additionally, in his brief herein, plaintiff states that he

does not oppose the dismissal of defendant McGrath.  That defendant is hereby dismissed.

Accordingly, only defendants Simone and City of Cleveland remain.

The following facts are taken from the depositions of plaintiff and Officer Simone, as

well as plaintiff's declaration.  The Court has also viewed a video of the incident recorded

from a dash-mounted camera on Simone's police cruiser (the DashCam video) submitted by

the parties.[1]

According to Cleveland Police Officer Simone's deposition testimony, the incident

occurred in the following manner.  Around 6:00 in the evening of May 15, 2010, Simone

responded, while on duty in his one person zone car, to a radio broadcast concerning the area

of around W.28th Street and Detroit Ave. in Cleveland, Ohio.  The radio broadcast gave a

description of a suspect and the location of the Bounce Bar on Detroit Ave.  The broadcast

indicated the suspect was a male with a gun.  Simone could not recall whether he was backing

up the other officers who arrived at the scene shortly after him, or whether he responded to

the dispatch first and they were backing him up.  Simone was on Interstate 90 when he heard

the broadcast, and then made his way off the freeway and to the location.  Simone saw

plaintiff, who fit the physical description of the suspect as broadcast over the radio, walking

west on Detroit Avenue.  Simone pulled the zone car up, pointing the car towards plaintiff so

that the DashCam was facing plaintiff.  Based on the broadcast, Simone believed plaintiff was

---

[1]     The video does not include sound.

2

armed.  Simone exited his car, with his service gun in one hand and a Taser in the other.  The

other officers had not arrived at that point.  And,

> I stopped him at gunpoint.  I told him to go to his knees, then go on the ground to his
> face.  For some reason he shucked off his pack, which I initially thought he was going
> to try to bolt and run, that's why he was dropping his pack to the ground.  He took off
> the wrapping on his neck and laid it down.  He didn't do as I told him to do.  I told
> him to go to his knees.  He dropped to one knee; he put his hands down.  I told him to
> go on his face.  He wouldn't go to the ground.  This went on for approximately 45
> seconds, and subsequently I then tasered him.

Simone thought that by "dropping the pack," which Simone did not instruct him to do,

plaintiff was either going to attack him or run. Because Simone considered plaintiff to be

armed, he construed his refusal to follow the verbal commands as a threat to Simone's life:

"Had he just done what he was instructed, nothing would have happened to him, but he

didn't.  He didn't go down, he didn't want to get on his face, he didn't want to do the things I

was trying to do so I could get control of the situation."  Although he finally got down on two

knees, plaintiff refused to get down.  Because Simone believed plaintiff had a gun, he was

trying to get him "on the ground prone" so that he could be checked for a weapon. Simone

wanted plaintiff face down on the ground with his hands on the ground looking away from

Simone so that if plaintiff pulled a gun he would not know where Simone was standing.

Instead of getting on the ground, plaintiff removed the wrapping from his neck. "His conduct

caused me to heighten my altertness.  His conduct caused me to taser him.  I don't know if

he's got a gun in his waistband, in a sock tied to his neck.  All I know is he's not - - for some

reason he's not doing what I want him to do, so I'm not going to let him get up and run.  I'm

not going to let him come after me.  All he's got to do to stop this right now at this point is lay

on his face, and this is over with." Shortly before Simone fired the Taser, plaintiff "dropped

his hands down by his lap." "He brought his hands down by his waist." His hands "were in the air, and he brought them down by his waist.  Right after that I fired."  Simone further testified:

> Q.  Is it your testimony today that [plaintiff's] hands were at his waist or in the air at the moment you tased him?
>
> A.  At the moment I tased him and I'm going on a memory from a year ago, he brought them down, and when he started to bring them up, at that point I fired.

Immediately after Simone tasered plaintiff, the other officers arrived. After he was subdued, Simone learned that plaintiff did not have a gun. Simone arrested plaintiff for assault after talking to the victim and learning from her that plaintiff had spit in her face at the Bounce Bar.  He was also arrested for "obstructing" for his failure to comply and disorderly conduct due to what Simone perceived to be an impaired condition.  (Simone depo.)[2]

Plaintiff's declaration sets forth the following facts.  On May 15, 2010, plaintiff was lawfully walking in a westerly direction on the sidewalk adjacent to Detroit Avenue near West 28th Street when Officer Simone came up upon him in his police cruiser.  Simone exited the cruiser with his firearm drawn and pointed at plaintiff. Plaintiff did not know why Simone was stopping him. Simone instructed plaintiff to stop, take off his backpack and place it on the ground, get on his knees, take off the tee shirt that was wrapped around his neck, and to put his hands up.  Initially, plaintiff went down to the ground on one knee and then shortly to both knees when instructed to get down/ get on the ground/ get on his knees. Plaintiff complied with all of Simone's instructions, and did not attempt to flee.  He did not have a gun

---

[2]    Defendants state that plaintiff was subsequently charged with obstructing official business and disorderly conduct, and a *nolle prosequi* was later entered on the charges.

4

or other weapon, and was not intoxicated.  He had not assaulted or spit on anyone on that

date.  Simone did not tell plaintiff why he was being stopped, or warn him that he would be

tasered. Plaintiff never reached for his waistband. (pltf. decl.)

Plaintiff testified at deposition in relevant part as follows.  He went to the Bounce

Nightclub on the night at issue in order "to urinate," but when he told the woman inside of his

purpose she screamed that he was not allowed in there.  In response, plaintiff said, "Oh, my

God, you bitch" and walked away.  He did not spit on her. After leaving, as plaintiff was

walking on Detroit, a police car pulled up, the police officer jumped out, and pointed his gun

at plaintiff.  The police officer "said something, I don't know what the order was but I do

remember something about taking your book bag off, get on your knees and put your hands

up. As soon as I put my hand up I was shot."  Plaintiff had not had any alcohol or drugs on

that date. (pltf. depo.)

The DashCam video appears to show the following in relevant part.  Plaintiff is

walking on the sidewalk as Simone's police car approaches.  The car pulls up.  Plaintiff is

walking and comes to a stop.  He puts his hands up.  He takes his backpack off.  He goes to

one knee.  Simone can be seen approaching with his gun drawn.  Plaintiff goes to two knees.

His hands go to his thighs.  He takes the shirt around his neck off. Plaintiff puts one or both

hands up.  This is unclear from the video as Simone's body is partially blocking plaintiff and

only one hand can be seen around Simone's body. [3]   Plaintiff is tasered at that moment. The

---

[3]        When asked at deposition whether plaintiff had his hands up at that point in the
video, Simone stated, "I think it - - I can't say for sure because I can't see it, but I
think he does.  I'm just arguing with him about getting on the ground."  (Simone
depo. 244)

5

second police car pulls up and the officers exit the car at about the same time that plaintiff is tasered. (Doc. 26) As there is no audio, the Court has no knowledge of what Simone might be saying to plaintiff.

Officers Wright and Craska, who had exited their zone car at the moment plaintiff was tasered, reached plaintiff as he dropped sideways to the pavement.  These two officers handcuffed and searched plaintiff.

Plaintiff filed this Complaint setting forth seven claims for relief.  Count One alleges excessive force pursuant to § 1983 against Simone. Count Two alleges false/wrongful arrest/imprisonment pursuant to § 1983 against Simone. Count Three alleges malicious prosecution pursuant to § 1983 against Simone. Count Four alleges customs and polices causing constitutional violations pursuant to § 1983 against the City of Cleveland. Count Five alleges state law false arrest/imprisonment against Simone.[4]  Count Six alleges a state law claim of malicious prosecution against Simone.  Count Seven alleges state law assault and battery against Simone.

This matter is now before the Court upon the motions for summary judgment filed by the City of Cleveland and Simone.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477

---

[4]     The Complaint alleges the state law claims against the City as well.  However, plaintiff acknowledges in his brief that dismissal of these claims is appropriate. Therefore, Counts Five, Six, and Seven against the City of Cleveland are dismissed.

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates
> the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its

resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported
> as provided in this rule, an adverse party may not rest upon the
> mere allegations or denials of [his] pleadings, but [his
> response], by affidavits or as otherwise provided in this rule,
> must set forth specific facts showing that there is genuine issue
> for trial.  If he does not respond, summary judgment, if
> appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most

favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th

Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562

(6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must

"produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53

F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Officer Simone**

**(a) Section 1983**

**(i) Excessive Force**

Section 1983 provides a cause of action to those deprived of a constitutional right by law enforcement officers acting under the color of state law. *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir.2000). Defendant Simone raises the defense of qualified immunity. "Under that doctrine, government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Schreiber v. Moe*, 596 F.3d 323 (6th Cir. 2010) (citing *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir.2009)). Thus, in determining the applicability of qualified immunity, a court first asks whether the officer's conduct violated a constitutional right. If no constitutional violation is found, "the inquiry stops, the § 1983 claim fails as a matter of law, and the officers do not need qualified immunity." *Williams v. Sandel*, 2011 WL 2790474 (6th Cir. July 13, 2011) (citations omitted). If a potential

8

constitutional violation is found, the court asks "whether the right was clearly established in light of the specific circumstances of the case." *Id.*

This Court, then, must determine whether a constitutional violation occurred. The Fourth Amendment prohibits the use of excessive force by arresting officers. *Meirthew v. Amore*, 417 Fed.Appx. 494 (6th Cir. 2011) (citations omitted). The Sixth Circuit recently summarized the contours of a Fourth Amendment excessive force claim:

> 'A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable.' *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir.2011). Whether a constitutional violation based on excessive force occurred 'depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.' *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir.2007) (citing *Graham v. Connor*, 490 U.S. 386, 395–96 (1989)). In making its determination, the Court should 'pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' ' *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir.2010) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir.2001)). This is not an 'exhaustive list,' and the inquiry ultimately turns on whether the seizure was reasonable under the 'totality of the circumstances.' *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008).

*Bozung v. Rawson*, 2011 WL 4634215 (6th Cir. Oct. 7, 2011). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. O'Connor*, 490 U.S. 386, 396–97 (1989).

Additionally, although this Court evaluates the decision to use force "from the perspective of an objective officer, the facts must still be viewed in a light most favorable to the plaintiff." *Id.* (citing *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008)).

9

With regard to the DashCam recording, the Court must "determine as a matter of law whether the events depicted on the video, taken in the light most favorable to [plaintiff], show that [Officer Simone's] conduct was objectively reasonable." *Dunn v. Matatall*, 549 F.3d 348 (6th Cir. 2008).

"Qualified immunity is warranted even if a constitutional violation has occurred if the right violated was not clearly established." *Rodriguez v. City of Cleveland,* 2011 WL 3792371 (6th Cir. Aug. 26, 2011) (citations omitted). Thus, "to defeat qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed." *Meirthew,* 417 Fed.Appx. at 498.

Defendants first argue that Simone's conduct did not violate plaintiff's Fourth Amendment right.  Second, defendants assert that even if he had, the right to not be tasered under these circumstances was not clearly established. For the following reasons, this Court disagrees.

Defendants assert it is undisputed that Simone understood that he was apprehending an armed suspect who had just assaulted someone in a bar, and that plaintiff only partially complied with Simone's commands by initially getting down on only one knee, lowering his hands to his lap instead of keeping them up, and refusing to go prone onto the sidewalk.

Simone's testimony clearly shows that he had information that plaintiff was armed with a gun.  It does not show that he knew he had assaulted someone in a bar:

> Q. ... Did the dispatch call give you any information about what was alleged to have transpired at Bounce?
>
> A.  I don't remember.  I would have to listen to the tape.

(Simone depo. 105)  Simone's Field Narrative Report, however, does show that he was

10

responding to a "call of a disturbance at the Bounce" (Simone depo. Ex.) and he believed he was approaching a man with a gun.  Nonetheless, while defendants contend that the DashCam recording shows that plaintiff only partially complied with Simone's commands, the video is not conclusive because it has no sound.  The Court cannot hear whether or not Simone told plaintiff to remove his backpack/shirt or whether he was told to get down on the ground face down.  Furthermore, while Simone testified that he ordered plaintiff to get down on the ground face down and that he did not tell him to take off his backpack or shirt, plaintiff's version of the facts is that Simone ordered him to take off his backpack and shirt, get down/get on the ground/get on his knees, and put his hands up.  There is an issue of fact as to what commands were given to plaintiff and, therefore, whether he complied.

Defendants also assert that plaintiff took actions that would indicate to a reasonable officer in Simone's position that plaintiff was preparing to either flee or fight as evidenced by the fact that when Simone ordered him to his knees, plaintiff first removed his backpack and then got to only one knee.  Once on both knees, plaintiff also removed the shirt from around his neck.

Simone testified:

I told him to go to his knees, then go on the ground to his face.  For some reason he shucked off his pack, which I initially thought he was going to try to bolt and run, that's why he was dropping his pack to the ground.  He took off the wrapping on his neck and laid it down.  He didn't do as I told him to do.  I told him to go to his knees. He dropped to one knee; he put his hands down.  I told him to go on his face.  He wouldn't go to the ground.

Plaintiff testified: "[Simone] said something, I don't know what the order was but I do remember something about taking your book bag off, get on your knees and put your hands

11

up. As soon as I put my hand up I was shot."   Plaintiff stated in his declaration that Simone instructed him to stop, take off his backpack and place it on the ground, get on his knees, take off the tee shirt that was wrapped around his neck, and to put his hands up.  The declaration further states that plaintiff initially went down to the ground on one knee and then shortly to both knees when instructed to get down/ get on the ground/ get on his knees, and that he complied with all of Simone's instructions and did not attempt to flee.

 While plaintiff's version of the event does not include Simone's order to get face down on the ground, both versions of the incident show that Simone ordered plaintiff to get to his knees and that he initially only got to one knee.  This could appear to a reasonable officer that plaintiff was positioning himself to flee or fight. Plaintiff then, however, got to both knees.

 Next, defendants assert that plaintiff dropped his hands down to his lap area, a common place for suspects to stash weapons.  Defendants support the latter assertion with their expert opinion. Simone testified that plaintiff brought his hands "down by his lap" or "down by his waist" and "whether he was going to reach for a weapon or not, I don't know, and I didn't wait."  The video shows plaintiff dropping his hands to around his thighs.  But, a reasonable officer could perceive an armed suspect whose hands drop from a held up position as threatening.  And, even plaintiff testified that Simone ordered him to put his hands up. Nonetheless, plaintiff had raised his hands again when Simone tasered him.

 Finally, defendants contend that plaintiff refused to comply with Simone's order to go face down on the sidewalk.  As discussed earlier, there is an issue of fact as to whether this order was made.  Contrary to defendants' argument, an order to "get on the ground" does not

12

necessarily mean prone.

Based on the foregoing, there is an issue of fact as to whether plaintiff was complying with Simone's orders.

The Court is mindful of the three factors referred to above in determining whether excessive force was used, i.e., the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

The Court finds the first factor to weigh in Simone's favor as he had information that plaintiff was carrying a gun. Simone testified, "I stopped him for a reported crime, and that was carrying a gun, and that's what I stopped him for." The final two factors, however, are open to dispute based on the discussion above. There is an issue of fact as to whether plaintiff posed an immediate threat to Simone or others by refusing to go face down on the ground, and whether he was actively resisting arrest by failing to follow Simone's commands or attempting to evade arrest by flight.

Defendants contend that this Circuit recognizes that armed suspects may be treated differently by the police. Defendants rely on *Causey v. City of Bay City*, 442 F.3d 524 (6th Cir. 2006). That case, however, addressed factors giving rise to exigent circumstances alleviating the need for a warrant.

Defendants also note that in *Leong v. City of Detroit,* 151 F.Supp.2d 858 (E.D.Mich. 2001), the court recognized that a police officer need not wait for a suspect to draw a weapon before the officer is permitted to take defensive action. In that case, the court stated:

> Plainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or bystander in an instant, with disastrous consequences. This Court is aware of

13

no case, and Plaintiff has not cited one, which would compel a police officer to await
such an occurrence, despite otherwise having determined that a suspect is armed and
poses an imminent threat of serious harm to the officers or others in the vicinity.

Here, there is an issue of fact as to whether plaintiff posed "an imminent threat of serious

harm."

The Court does agree with defendants' contentions that plaintiff wrongly assumes that

Simone had a duty to warn plaintiff before using the Taser and that the arrival on the scene by

the two other officers just as Simone was firing the Taser shows that Simone acted

unreasonably because backup was then present.

For these reasons, there is an issue of fact as to whether a constitutional violation

occurred, i.e., whether the Fourth Amendment was violated with the use of excessive force by

an arresting officer.

Next, the Court must decide whether the right violated was clearly established. If not,

qualified immunity is warranted.  The right to be free from physical force when one is not

resisting the police is a clearly established right.  *Kijowski v. City of Niles,* 372 Fed. Appx.

595 (6th Cir. 2010) (citations omitted). An officer's gratuitous or excessive use of a taser

violates a clearly established constitutional right. *Landis v. Baker*, 297 Fed. App'x 453, 463

(6th Cir.2008). Based on the discussion above, the Court cannot conclude as a matter of law

that plaintiff was resisting Simone.

Defendants point to Sixth Circuit cases involving tasering.  Defendants assert that

*Roberts v. Manigold*, 240 Fed. Appx. 675 (6th Cir. 2007), is distinguishable because it

involved continued use of a taser after the arrestee had been subdued.  The Court agrees that

*Roberts* involved excessive use of the taser, but that case does not provide clearly established

14

law showing that one time use of a taser on a suspect who may be complying with police commands is not excessive.

Defendants maintain that *Kijowski v. City of Niles,* 372 Fed. Appx. 595 (6th Cir. 2010), is helpful because the plaintiff there, unlike here, was not resisting arrest and there was no threat of immediate harm when the police officer tasered him. But, as discussed above, there is an issue of fact in the present case as to whether plaintiff was resisting arrest or posing a threat of harm by failing to follow police commands and intending to flee.

Defendants contend that *Haupricht v. Contrada,* 2009 WL 5061762 (N.D.Ohio Dec. 15, 2009), is similar to the case herein.  The Court disagrees.  There, the plaintiff refused to be handcuffed and disregarded the officers' commands to remove and keep his hands from his pockets where he could have been hiding a weapon.  He continued to refuse to put out his hands after being knocked to the ground. Here, the Court cannot state whether plaintiff disregarded the officer's commands.

Based on the foregoing, Simone is not entitled to qualified immunity. Summary judgment is denied as to Count One.

### (ii) false arrest/imprisonment

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Arnold v. Wilder,* - F.3d -, 2011 WL 4056664 (6th Cir. Sept. 14, 2011) (citing *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir.2010). "Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Id.* (citations omitted). "Whether probable cause

15

exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.*

Defendants argue that this claim fails because the arrest was supported by probable cause as Simone had cause to believe that plaintiff had committed any one of the three offenses identified on the police report.  Namely, Simone had probable cause to believe plaintiff was the individual who had assaulted the person in Bounce Bar based on the fact that plaintiff matched the specific description of the suspect and was encountered walking across the street from the bar minutes after the assault was reported.  Defendants also argue that Simone had probable cause to believe plaintiff was intoxicated based on Simone's own observation of plaintiff's conduct and the officer's 38 years of experience.  Finally, defendants argue that Simone had probable cause to believe plaintiff obstructed official business based on his failure to comply with Simone's commands.

For the following reasons, the Court finds an issue of fact as to this claim.

Defendants assert Simone had probable cause to arrest plaintiff for assault.  Simone's Field Narrative Report shows that he was responding to a "call of a disturbance at the Bounce."  After tasering plaintiff, Simone's deposition testimony is that he walked across the street and talked with the female victim.  She told Simone that she previously knew plaintiff and that he spit in her face at the Bounce.   Plaintiff points out that physical harm is a required element of the offense of assault, and for spitting to constitute an assault the offender must have had or believed he had the potential to harm another as a result.  In response, defendants point to plaintiff's deposition testimony that he knew he had been previously diagnosed with Hepatitis C.  Ohio case law has upheld a conviction for felonious assault where the defendant

16

spit into another's mouth while knowing he was infected with a communicable disease such as Hepatitis C.  *State v. Price*, 162 Ohio App.3d 677 (5th App. Dist. 2005).  The fact of plaintiff's illness, however, would not have been within Simone's knowledge at the time of the arrest. Thus, Simone would not have had probable cause to arrest plaintiff for assault based on his information that plaintiff spit on the victim.

Defendants assert Simone had probable cause to arrest plaintiff for intoxication. Simone's Field Narrative Report shows that plaintiff was arrested for "disorderly/intox." (Simone depo. Ex.)  Simone testified that even had plaintiff complied with Simone's orders, he would have arrested him for intoxication.  Simone testified that he did not smell alcohol on plaintiff, but he considered him to be "high" and "obviously impaired."  Simone testified that plaintiff's eyes were dilated and he believed he did not follow his commands due to his impaired state. Simone testified that his 38 years of police experience dealing with intoxicated and impaired people left "no doubt in [his] mind" that "he was impaired when I dealt with him."  (Simone depo. 114-124).  As discussed above, however, there is an issue of fact as to whether plaintiff was following Simone's commands.  Furthermore, plaintiff's declaration statement is that he was not intoxicated, and he testified at deposition that he had not had any alcohol or drugs on that day.

Finally, defendants' assertion that Simone had probable cause to believe plaintiff obstructed official business based on his failure to comply with Simone's commands would fail for the same reasons stated above, i.e., there is an issue of fact as to whether plaintiff failed to follow commands.

Summary judgment is denied on Count Two.

17

### (iii) malicious prosecution

To succeed on a malicious prosecution claim under § 1983, a plaintiff must prove that (1) a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute, (2) there was a lack of probable cause for the criminal prosecution, and (3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure. *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) (citations omitted).

Defendants contend that this claim fails for lack of the probable cause element and for the additional reason that Simone did not commence or take part in plaintiff's prosecution.

Simone testified that he completed the report, but that someone else took it to the City prosecutor's office and signed the affidavit.  He testified that his understanding is that the "matter would be reviewed by a City prosecutor, and that the determination would be made as to if the charges were correct.  If they're not, they change the crime and make whatever they think is appropriate."  (Simone depo. 114, 196) Plaintiff does not dispute that Simone did not initiate the prosecution.  As one element of the claim is lacking, plaintiff cannot prove malicious prosecution.

Summary judgment is granted on Count Three.

### (b) state law claims

#### (i) false arrest/imprisonment and malicious prosecution

Summary judgment is denied on the false arrest/imprisonment claim (Count Five) and granted on the malicious prosecution claim (Count Six) for the same reasons stated above.

#### (ii) assault and battery

18

Defendants argue that Simone is entitled to immunity from this claim under Ohio Revised Code § 2744.03(A)(6) which provides statutory immunity from liability to police officers unless they are shown to have acted outside the scope of their employment or official responsibilities or "with malicious purpose, in bad faith, or in a wanton or reckless manner." This issue may be addressed by the Court "through the lens of the federal qualified immunity analysis." *Chappell v. City of Cleveland,* 585 F.3d 901 (6th Cir. 2009).  Therefore, summary judgment is denied as to this claim (Count Seven) for the same reasons stated above with regard to the excessive force claim.

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant James Simone is denied except as to Counts Three and Six.

### **(2) City of Cleveland- Custom/Policy**

Count Four alleges a § 1983 claim against the City for customs and policies causing constitutional violations. Defendants contend that summary judgment is proper because there is no evidence that the City had a custom, policy, or practice that caused the alleged violation.

It is well-established that a municipality may only be held liable under § 1983 when an official policy or custom causes an employee to violate another's constitutional rights.  *See Smith v. Patterson*, 430 Fed.Appx. 438 (6th Cir. 2011) (citing *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658 (1978)). There is no respondeat superior liability under § 1983.  *Id.*

Plaintiff herein does not have a problem with the City's written policies concerning use of force, but instead maintains that Simone acted pursuant to an unwritten official policy which was ratified by the City.  Plaintiff states:

19

> Defendant Simone acted pursuant to an official policy of the City of Cleveland, as ratified by Chief McGrath, when he shot Plaintiff with his Taser gun despite such force being objectively unreasonable and excessive under the circumstances. The policy and custom of the City of Cleveland Police Department, as followed by Defendant Simone according to Defendants, proximately caused the violation of Plaintiff's clearly established constitutional right to be free from the use of excessive force. The ratification of the overall policy that permitted the use of excessive force, the inadequate investigation surrounding the use of force, and of Defendant Simone's Tasering and arrest of Plaintiff was given by a final policymaker, Chief of Police, Michael McGrath.

(Doc. 31 at 7-8).  Plaintiff denies that his claim against the City is premised on respondeat superior and describes the violation as follows:

> [T]he unconstitutional customs and policies at issue and which proximately caused constitutional injury to Plaintiff are evidenced by a pattern of conduct by Cleveland police and the ratification of that conduct by the City of Cleveland. Plaintiff seeks to impose liability upon the City of Cleveland for its own conduct in implementing and acquiescing in those customs and policies, and for its ratification of Defendant Simone's conduct which violated Plaintiff's constitutional rights.

*Id.* at 8.

Plaintiff relies on law interpreting § 1983 which permits municipal liability based on ratification by a policymaker of a subordinate's act. See *Lentz v. City of Cleveland,* 333 F.Appx. 42 (6th Cir. 2009)(citing *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir.1993) (A "subordinate's decision may support municipality liability if ratified by an authorized policymaker.")The policymaker for whose conduct the plaintiff is seeking to hold the municipality liable must possess final authority to establish municipal policy with respect to the action ordered.

Following the incident herein, Cleveland Police Sergeant Murray prepared a use of non-deadly force report finding the use of force to be proper.  (Doc. 31 Ex. B) Plaintiff points to Murray's deposition testimony in the following relevant part. Murray only interviewed

Simone, and no other witnesses.  He did not interview plaintiff even though a General Police Order required an interview of the subject of the use of non-deadly force to be included in the investigation packet. Nor did Murray watch the DashCam video, although he knew about it. The report was concurred in by five reviewing officers and, ultimately, the Chief of Police who approved the use of force and also did not view the video.  In his more than 12 years of submitting use of force reports, no one in the chain of command has ever disagreed with Murray's conclusions.  Murray has never seen excessive force by a Cleveland Police Officer. (Murray depo.)  Plaintiff also points to Chief McGrath's deposition testimony that as Chief he, and not the City safety director, is ultimately responsible for issuing the policies and procedures that govern the use of force and use of force investigations.  (McGrath depo. 24)

Plaintiff contends that by determining that Simone's actions were within the City's guidelines, policies, and procedures, the use of force fell within the policies of the City and was ratified by the Chief of Police.

Plaintiff asserts that Chief McGrath, the official with final decision making authority, explicitly approved Simone's use of force and implicitly approved the grossly inadequate investigation and that this shows a custom of tolerance or acquiescence of constitutional violations.  Plaintiff contends that McGrath's approval constitutes ratification of an unwritten policy tolerating the use of excessive force by Cleveland police officers.  Additionally, based on Murray's testimony regarding his conduct in this investigation and his experience in the 12 years of performing investigations, plaintiff contends that the City has a "long-standing policy of failing to perform any meaningful investigation with regard to the use of non-deadly force" and "routinely approving any and all uses of non-deadly force"  As a result, plaintiff argues,

21

the City has a policy of condoning investigations into the use of force which rely only on the self-serving statements of the officer being investigated, and provide no meaningful review of the investigations. Consequently, due to the "repeated ratification," the City has created a custom that allowed Simone to use excessive force on plaintiff.

For the following reasons, the Court agrees with defendants that plaintiff cannot survive summary judgment on this claim.

Despite his assertions, plaintiff does not have proof of a *pattern* of conduct.  Plaintiff bases his theory on Sergeant Murray's testimony that during his time he never witnessed excessive force and his supervisors have agreed with all of his investigations. The City points out that Murray is only one of approximately 185 sergeants in the Cleveland Division of Police supervising over 1800 police officers.  Even aside from this, Murray's deposition testimony does not establish that the City ratifies *all* uses of non-deadly force.  A clear pattern is not demonstrated.  Plaintiff fails to point to evidence of other alleged incidents of excessive force which were supposedly ratified by the City.  Plaintiff does not have evidence of "repeated ratification."  Plaintiff's attempt to infer a municipal-wide custom or policy based on this one instance and on Murray's testimony that his investigations have always been approved even though he never found excessive force is not sufficient. There is no evidence that the City "routinely approves any and all uses of non-deadly force"

Nor does plaintiff establish that a City policymaker ratified Simone's alleged unconstitutional conduct, or knowingly approved a pattern of unconstitutional conduct. Defendants point out that in cases where a plaintiff attempts to use a single decision to establish a government policy, such as here, there must be proof that the incident was caused

22

by an existing, unconstitutional municipal policy attributed to the policymaker.  See *Morris v. Shelby Government*, 1998 WL 833777 (6th Cir. Nov. 13, 1998) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)) (Section 1983 liability based on a single incident may not be assessed against a municipality without a further showing that the incident was directly caused by an existing, unconstitutional policy or custom, which policy or custom can be attributed to a governmental policymaker.)

Plaintiff does not have evidence of an existing, unconstitutional policy based on the deposition testimony of Sergeant Murray and Chief McGrath.  Additionally, defendants point to Chief McGrath's testimony demonstrating that his review consisted of ensuring that the investigation was complete and within the applicable guidelines.  McGrath testified that the results of his review of the investigation were "that it was completed and reviewed by the chain of command, and that it was within the guidelines of our general police orders." (McGrath depo. 11-12) He also testified that he concluded that the use of force by Simone was within the guidelines. (*Id.*)  McGrath further testified that the "respective deputy chief for that arm of the organization" has final review of the investigation, and "once that's completed, it comes to my office, and I review the entire package to ensure that it was properly reviewed through the chain of command."  (*Id.* at 25)  Finally, when asked what his signature on the use of non-deadly force report means, McGrath responded, "It means that I reviewed it, and it was within the guidelines, policies, and procedures of the Division of Police as far as review, and that the investigation was completed."  (*Id.* at 25-26) Nor was McGrath aware at the time of his review that there was a video of the incident. (*Id.* at 10) On this basis, plaintiff cannot assert that the Chief approved an investigation that should have had

23

a video included.  Overall, plaintiff does not offer sufficient evidence that a policymaker ratified Simone's use of force knowing it to be excessive, or knowingly approved a pattern of unconstitutional conduct.

Even when viewed in the light most favorable to plaintiff, the approval of Simone's conduct by Murray and the subsequent approval of Murray's report by the "chain of command," are insufficient to establish an actionable "custom" or to create a genuine issue of material fact as to whether the City had such a custom.  There is no evidence that the alleged approval was part of a pattern.  Nor is there evidence that the single decision by the alleged municipal policymaker, Chief McGrath, was caused by an existing, unconstitutional policy or custom.

Summary judgment is appropriate as to Count Four.

**<u>Conclusion</u>**

For the foregoing reasons, summary judgment is denied as to Counts One, Two, Five, and Seven, and granted as to Counts Three, Four, and Six.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/28/11

24